distinctions between assaults and assaults to commit rape..

This was written as the opinion in the case, but my Brethren have thought it correct to affirm the judgment. I sign this as a dissent.

---

PARKER v. STATE.

(Court of Criminal Appeals of Texas. Nov. 13, 1912.)

1. INTOXICATING LIQUORS (§ 205*)—CRIMINAL PROSECUTION — INDICTMENT — ADOPTION OF LOCAL LAW.

An information in the county court for a sale of intoxicating liquor in violation of the prohibitory law, which alleges that such law was then in force, but does not allege the date when such law was adopted or put in force, should be quashed as not showing jurisdiction of the court.

[Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. § 225; Dec. Dig. § 205.*]

2. INDICTMENT AND INFORMATION (§ 161*) — AMENDMENT—MATTERS OF FORM.

A defect in an information for a sale of intoxicating liquor in violation of the prohibitory law, in not alleging the date when the law was adopted or put in force, is a defect of form, which is amendable.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 516–523; Dec. Dig. § 161.*]

Appeal from San Augustine County Court; W. C. Ramsey, Judge.

Walter Parker was convicted of selling intoxicating liquor in violation of the prohibitory law, and he appeals. Reversed and remanded.

Foster & Davis, of San Augustine, for appellant. C. E. Lane, Asst. Atty. Gen., for the State.

PRENDERGAST, J. The complaint and information in this case charge appellant with violating the prohibition law, in that on or about March 23, 1912, he made a sale of intoxicating liquor to Will Coleman.

[1] Neither the complaint nor information, although alleging that prohibition was in force, alleges the .date when put in force by the proper election, orders, etc. The appellant was convicted, and given the lowest penalty for a misdemeanor in making such sale. The statement of facts even does not show when the prohibition law was put in force and effect; it merely stating that it was in full force and effect on March 23, 1912. The appellant made a motion to quash the information, because it did not show that the county court had jurisdiction to try and determine the case, which was overruled by the court. As appellant correctly and properly raised the question in time, it was the duty of the court to have sustained his motion, under the rulings of this court.

[2] The defect in the complaint and information in not charging the date prohibition was put in force in San`Augustine county by the proper election, orders, etc., was a defect of form, which could have been amended, and thereby rendered them sufficient, under the rulings of this court. As this was not done, this court must necessarily reverse and remand the case. Hamilton v. State, 145 S. W. 348; Meyer v. State, 145 S. W. 919; Head v. State, 141 S. W. 537; Mealer v. State, 145 S. W. 354, and cases cited in said decisions.

It is unnecessary to decide any other question attempted to be raised in this case.

The judgment is reversed, and the cause is remanded.

---

BERGIN et al. v. MISSOURI, K. & T. RY. CO.

(Court of Civil Appeals of Texas. Texarkana. Oct. 24, 1912.)

1. CARRIERS (§ 77*)—IMPLIED OBLIGATION OF CARRIER.

At common law the implied obligation of a common carrier was to transport freight by continuous passage from the point of delivery within a reasonable time, and the carrier was not bound to permit the stoppage in transport.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 272–279; Dec. Dig. § 77.*]

2. CARRIERS (§ 32*)—INTERSTATE COMMERCE —STATUTORY REGULATIONS.

The schedule of rates of a railroad company filed with the Interstate Commerce Commission including in one classification syrup and molasses did not provide for any stop-over privilege in the shipment of these commodities, although the schedules for other commodities provided for stop-over privileges. Interstate Commerce Act June 29, 1906, c. 3591, § 6, 34 Stat. 586 (U. S. Comp. St.' Supp. 1911, p. 1289), provides that no carrier shall engage in the transportation of property, unless the rates for which the same are transported have been filed and published in accordance with the act, etc., nor shall any carrier extend any privileges in the transportation of property except such as are specified in the tariff. Held that, as the allowance of stop-over privileges was not a part of the carrier's obligation, an agreement for the stop-over of a car of syrup, though based on consideration, is invalid, because other' shippers could not require the same service.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*]

3. CONTRACTS (§ 138*) — ILLEGALITY — ACTIONS FOR BREACH.

No action to recover damages for the breach of an illegal contract may be maintained, for such action is in effect an attempt to enforce such illegal contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681–700; Dec. Dig. § 138.*]

Appeal from District Court, Franklin County; P. A. Turner, Judge.

Action by J. H. Bergin and others against the Missouri, Kansas & Texas Railway Company. From a judgment for defendant, plaintiffs appeal. Affirmed.

L. W. Davidson and R. T. Wilkinson, both of Mount Vernon, for appellants. Dinsmore, McMahan & Dinsmore, of Greenville, and Alex S. Coke, of Dallas, for appellee.

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

HODGES, J. The appellants, Bergin, Gurdon, and Fleming, were joint owners of 3,272 gallons of ribbon cane syrup which they desired to ship to points in Oklahoma for sale. In November, 1908, they applied to the agent of the appellee at Winnsboro, in Wood county, Tex., for a car in which to ship their goods. The car was furnished and the syrup loaded on December 4, 1908, at Scroggins, a small station near Winnsboro, and at which the railway company kept no agent. A bill of lading was issued naming Colgate, Okl., as the point of destination, and the freight charges were prepaid to that place. At the time the contract of shipment was made, the appellants had an agreement with the railway agent that in consideration of $5, then paid, they were to have the privilege of stopping the car containing their syrup at Atoka, Okl., an intermediate point 15 miles from Colgate. This stop-over privilege was desired and given in order to allow time and opportunity to unload and sell a part of their goods, and was to continue during the next succeeding Monday and Tuesday. The agent at Winnsboro was fully informed of the purposes and time for which the stop-over privilege was wanted, and indorsed on the bill of lading the words: "Stop at Atoka to part unload." Relying upon this agreement to stop the car at Atoka, appellants advertised that they would offer their syrup for sale at that place on the following Monday and Tuesday, and received assurances that they could have sold large quantities of their goods at 65 cents per gallon had the car been stopped as contracted. The car was not stopped in accordance with the agreement, but was carried through to Colgate, its ultimate destination, to which the freight charges had been paid. It arrived at Colgate on Friday preceding the Monday on which appellants had advertised their sale to take place in Atoka. Appellants knew on Saturday that the car had been carried through, and they demanded its return to Atoka upon the original bill of lading without tendering or offering to pay any additional freight charges. The regular freight rate from Colgate to Atoka for such goods in car load lots was $28 according to the published schedule. The railway agent at Colgate declined to return the car upon the original bill of lading without instructions from his superior officers, and referred the matter to them. He would, however, have returned the car had appellants paid the usual freight charges from Colgate to Atoka, and requested its return. On Tuesday evening following appellants were notified by the railway agent that the railway company had declined to return the car upon the original bill of lading, and without the payment of the usual freight charges. Appellants then proceeded to sell their goods at Colgate and other places at what is claimed by them to have been prices

150 S.W.—75

less than they could and would have received had they been permitted to stop the car at Atoka according to their agreement. From this testimony it appears that they sustained damages amounting in the aggregate to something over $700. To recover those damages upon the ground that the contract to stop over had been broken is the purpose of this suit. The case was submitted to the court without a jury, and judgment rendered in favor of the defendant in the suit. From that judgment the plaintiffs below have appealed.

[1-3] While the appellee filed in the court below general and special exceptions to the appellants' petition, and a general denial, the defense which seems to have been mainly relied on, and which presents the only question discussed in the briefs on this appeal, is the illegality of the contract granting the stop-over privilege at Atoka. It is alleged in the answer and sustained by the evidence that the appellee had prior to the date of this contract of shipment prepared and filed with the Interstate Commerce Commission rate sheets and schedules fixing and showing the joint and through freight rates and charges for the shipment of different classes of freight and commodities from points in Texas, including Scroggins and Winnsboro, to points in Oklahoma, including Atoka and Colgate; that such tariff sheets had been filed with the Interstate Commerce Commission, and posted in the manner required by the Interstate Commerce Act then in force. The tariff sheets above referred to included one classification covering syrups and molasses, but these did not provide for any stop-over privilege in the shipment of such commodities between points in Texas and Oklahoma. No provision whatever was made for the grant of any such privilege in the transportation of that class of freight including syrups and molasses. In the tariff sheets applicable to other commodities belonging to a different class provision was made for a stop-over privilege, for which $5 per car was the usual charge. The record does not disclose what character of freight entered into and formed the class with reference to which this privilege was allowed. It only appears that it did not include syrups and molasses.

The judgment rendered in the court below was a general one, the record containing no special conclusions of the court either of law or fact; but it is manifest from the facts as agreed to and presented in this court that the trial judge based his judgment entirely upon the conclusion that the contract for the stop-over privilege was illegal and void because it had not previously been incorporated in the railway tariff sheets and published in accordance with the requirements of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154). An attack upon that ruling and construction of the

law presents the sole question involved in this appeal.

The appellee assails the sufficiency of the only assignment of error appearing in the brief of the appellants. But we refrain from discussing that question, believing that the ends of justice will be best subserved by resolving all doubtful issues in such cases in favor of the party appealing. In their argument the appellants contend that a privilege granted by a common carrier permitting a shipper to stop a cargo of freight at an intermediate point while in transit for the purpose of unloading a part of it is no part of the service of transportation, and is not one which is required by the Interstate Commerce Act to be published in the railway tariff sheets as a condition upon which it may be accorded to shippers. We make the following excerpts from section 6 of the Interstate Commerce Act as it stood after the amendment of 1906 (Act June 29, 1906, c. 3591, 34 Stat. 586 [U. S. Comp. St. Supp. 1911, p. 1289]) and at the time this controversy arose: "That every common carrier subject to the provisions of this act shall file with the Commission created by this act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print, and keep open to public inspection, as aforesaid, the separately established rates, fares and charges applied to the through transportation. The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation, and facilities defined in this act. * * * No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the Commission and to the public published as aforesaid, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates, fares, or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection: Provided, that the Commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting, and filing of tariffs, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions. * * * No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs. Provided, that wherever the word 'carrier' occurs in this act it shall be held to mean 'common carrier.' "

It is but repeating what has often heretofore been declared by the higher courts to say that one of the purposes of the Interstate Commerce Act in its original enactment was to prevent unjust discrimination by carriers in the transportation of freight, and to compel, in so far as it could be done by law, the extension of uniform rates to all shippers. When we trace the different amendments which have been added from time to time as new and unprovided for instances of discrimination arose, we cannot fail to be impressed with the vigilance and zeal with which that purpose has been pursued by Congress. As a means of accomplishing that end, common carriers are now required, as a condition upon which they are permitted to engage in interstate commerce, to publish and file with the Interstate Commerce Commission tariff sheets showing their rates of freight and charges.

for the services which they engage to render in the transportation of goods. If, in addition to their common law obligations and statutory duties, they undertake to perform any special service, or allow any particular privilege, in connection with and as a part of their transportation services, these also must be published and filed with the Commission. C. C. Folmer v. Railway Co., 15 Interst. Com. Com'n R. 33; Kile et al. v. Railway Co., 15 Interst. Com. Com'n R. 235; C. & A. Ry. Co. v. Kirby, 225 U. S. 155, 32 Sup. Ct. 648, 56 L. Ed. 1033. At common law the implied obligation of a carrier was to transport freight by continuous passage from the point of origin, and to deliver it at its destination within a reasonable time. This rule permits no stoppage while in transit for the benefit of the shipper with the privilege of later resuming the journey under the original contract of carriage, and at the same through rate. If the shipper becomes entitled to such a privilege, it must be obtained by a special arrangement with the carrier, for which the latter would be entitled to make an additional charge independent of its regular freight rate. In the absence of such an arrangement, the carriage of freight would be continuous and uninterrupted. The privilege of having this car load of freight stopped at an intermediate point in order that the shipper might do something in connection therewith for his own benefit is neither a statutory nor a common-law right, and cannot be demanded without special contract. The question then arises, Is it a service within the meaning of the statute which when granted to one shipper must be granted to all who demand it? The language of the statute is: "Nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privilege or facilities in the transportation of passengers or property, except such as are specified in such tariffs." A stop-over privilege for a sufficient length of time to enable the shipper to test the market, dispose of a portion of his goods, and have the remainder carried to destination at the same through rate of freight, and under the original contract of shipment, is undoubtedly a valuable one to some shippers. It is one for which the carrier could justly claim additional compensation, not only because of its value to the shipper, but on account of the increased service required and the lengthening of time of its responsibility for the care of the goods. Such a service requires that the car containing the freight should be taken out of the train in which it had been carried, and switched to a position where it would not interfere with the regular traffic. It also involves the detention of a car as a place for storing the goods during that time, thereby depriving the carrier of its use in the course of its business; and,

after the time for the stop-over had expired, the car would again have to be incorporated into another train, and hauled to its destination at the same rate. If a carrier should grant this privilege to one shipper and refuse it to another, it would be guilty of an unjust discrimination. Any service which a carrier may render to a shipper in the transportation of his freight, or any privilege which it may accord in connection therewith which confers a benefit on the shipper, must under the law be available to all shippers upon the same terms and conditions. C. & A. Ry. Co. v. Kirby, supra. Whatever privilege is given by carriers which falls within that class must also be incorporated in the published railway tariffs and filed with the Interstate Commerce Commission, in order that all shippers may be apprised of their rates and the terms upon which they may be obtained. Until this is done, a grant of such a privilege is unlawful, and a contract to perform the service required is void. If in the case before us the privilege of stopping while in transit the class of freight in question had not been published as required by the statute, the agent of the appellee at Winnsboro had no right to enter into the contract shown in evidence; in fact, the contract which he made seeks to impose an obligation which the statute forbids. To allow appellants to recover the damages sought, which they claim resulted from a failure to perform that obligation, would in legal effect be to enforce an unlawful agreement. This the courts will not do. T. & P. Ry. Co. v. Mugg & Dryden, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011; T. & P. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075. The fact that a stop-over privilege was allowed in other classes of freight which did not include syrups and molasses, and that this privilege and its rate had been published in the appellee's tariff sheets as required by law, does not alter the situation. No shipper of syrups and molasses could have demanded an extension of that privilege to the shipment of his commodities, when by necessary implication they had been excluded from the class of freight to which the privilege had been expressly made applicable. When freight is divided into groups and classes for the purpose of fixing charges for transportation, and other purposes in connection therewith, each separate group or class, and all the commodities belonging to it, must be considered as distinct objects of contract, and each handled according to the published schedules and tariffs applicable thereto. Hence we conclude that the trial court correctly held that the contract upon which the appellants rely was illegal and void and cannot form the basis for a recovery of the damages sought.

The judgment is therefore affirmed.